Maher v. Global Factors, LLC, case number 24-2068. Good morning. Good morning. Good morning, Brian Griffin, Flora Goldstein for Global Factors and Ralph Johnson. This is the case of the investments in small business accounts receivables leading up to COVID-19. I'd like to address loss causation and that the case should be dismissed as in the cases that we cite and some of the cases that Judge Leiden cites at pages 51-56 of a subpoena where he addresses loss causation. Plaintiffs concede, quote, the pandemic caused an economic collapse, page 16 of their brief, but they failed to even attempt to prove that an honest investment of this type would have suffered no loss, nor that $295,000 of the $14.4 million portfolio, a small 2%, caused any harm or the collapse and that it wasn't COVID. And that's what's required in the intervening event cases. We have Judge Posner's Bastion dismissing a complaint. This court's first nationwide case dismissing the complaint. Judge Kearse, your 1980 decision in Canfield dismissing the securities fraud claims after base trial due to an intervening cause, their market conditions deteriorating for new securities. Now, Judge Leiden cites loss causation cases that are extremely helpful to my point and some that are highly distinguishable. Helpful is this court's Citibank case, which dismissed the complaint because as to one factor, the non-disclosed $7 million was only a, quote, unquote, small portion of the $147 million transaction, less than 5%. May I ask a question?  When we have a trial record and then a finding from a district court about loss causation, is that not a finding that's subject to clear error review? The standard, you know, we address it as de novo. That's a good question, Your Honor. Perhaps you're right. Well, hopefully all my questions are good, but just answer that question. Yeah. I don't recall the standard review that was used in Canfield where it was after trial, perhaps it's addressed there. Because there seems to be, it seems to be quintessentially, particularly after a trial, a factual finding. Did, were the losses caused, the proximate cause, loss causation, however you want to describe it, caused by the defendant's alleged found misappropriation of funds. That's the, that seems to be quintessentially to be a factual determination. Am I right or wrong about that? Well, I believe it's still a legal issue, loss causation. What's the legal issue when you're trying to determine COVID or misappropriation and the district court decides, well, maybe some COVID, but at least some is as a result of the misappropriation of funds? No, well, the way I read all the loss causation cases is many of them are just on the complaint itself, and I can cite the ones that Judge Lyman cited. And so that is a legal issue. The fact that it happens after trial, I didn't see any separate analysis in Canfield or the other cases that came up after trial. So the finding is the global factors was not able to collect in part because some of the purported purchases of receivables were shams. And the not able to collect part is the loss causation element. So how is that not a factual finding subject to clear error review? Well, as Your Honor notes, the share labeling was limited only to $295,000, the $14.4 million portfolio. And it just makes no sense that in light of COVID, it was the plaintiff's obligation under the cases of Bastion, First Nation Employed Bank, to prove that an honest investment of this type would not have suffered the loss. And they did not even try to do that. So that's the legal fault in that there's nowhere in the record that that was attempted. And even if you wonder where to give plaintiff's back this $295,000, it comes out the pocket change, considering the percentage of the entity that he owned or had rights to, which comes out to like $17,000 or $20,000. But we don't really get there because loss causation assumes there's a fraud. And that would take care of the fraud claim here, too, which is a higher standard of proof. I understand clearly convincing use of preponderance of the evidence. I just wanted to, if I could, address Judge Leiden's other cases and why they're distinguishable. In Castellano v. Young and Rubicon, the defendants denied they were going to purchase—they denied they were going public when they offered to purchase the employee's stock, and that directly caused the economic harm. And in Vendee, this court failed to disclose—I'm sorry, this court didn't fail to disclose, the defendants failed to disclose extreme liquidity risks. They were running out of funds while they were buying companies, and there were 50 more warnings of internal warnings by the employees, like, I feel we're about to crash, and I'm in the passenger seat. It collapsed, and they caused a loss. And in Double Line, it was an undisclosed massive bribery scheme. Let me go back. Sure. So let's take the Madoff case. Which case? The Madoff case. Madoff, right. Madoff, Bernie Madoff, right? The financial crisis is in 2008, and then Mr. Madoff, his fraud, his misappropriation of investor funds is disclosed in December 2008. Is that—can he say, oh, that's the financial crisis and not my misappropriation of funds? What's the answer to that? I think the answer is that was an obvious fraud. It was an admitted fraud. So you are relying on, I think, as part of your loss causation argument, you're relying on the lack of obviousness of this misappropriation? It was only a small 2% that they're saying—and by the way, we also in our briefs attacked the fraud finding because there are findings of fact that have no basis in the record. Like Judge Reiner says, they didn't have money to pay in that other fund, and that was not the testimony at all. It was that Langhamer did not make—and Langer admits that he did not ask for the redemptions in due time to get the money, and they couldn't be paid to him because of that. And Langhamer himself, and I've stated in my brief many times, says, I had to wait 27 months to get my money, and they needed it for my restaurant. And Judge Reiner takes that and says, they didn't have the money. There's nothing in the record that says that. He just made it up out of thin air. And so we attack that, and I—that in light of the loss causation argument, I think it's very clear in all the cases that we have—oh, I just left out two more. Again, Merrill Lynch—the two cases brought against Merrill Lynch at these sites where the price for—I'm sorry. Actually, what you're asking—there are two pump-and-dump cases—maybe that's comparable to Madoff—that Judge Lyman cites where the price fall was caused by the defendants. We didn't cause COVID, and we didn't cause a collapse of the whole—you know, a $14.4 billion portfolio didn't fall because we gave a loan that was fully collateralized of $295,000. I mean, it just doesn't make sense. I think I've covered all the cases. He's like, two of my time's up. You reserve two minutes for rebuttal, so we'll hear from you again. Thank you very much. Thank you. Mr. Silverstein. Good morning. Good morning, Your Honors. And, Michelle, please support Sam Silverstein. I represent Dennis P. Marr and the Mary E. Marr Residuary Trust. Marr, okay. Marr, yes. Let me start where my colleague began, which is back to law supposation and Your Honors' question regarding is law supposation an act-based inquiry? Well, this Court has held that in emergent capital that, yes, the termination of an intervening act that would break the chain of law supposation is a matter of proof to be held at trial. And at trial, Judge Lyman, after a three-day bench trial, determined that COVID was not an intervening act. In fact, COVID simply exposed the fraud, that fraud being that at least the loans made to Wall Street Pizza were shams. They were to cover a debt owed from one of Mr. Johnson's other businesses to pay Mr. Langhammer. There is no evidence whatsoever whether or not that was credited back to global factors. And I believe, as the Court again in Lent will make the same decision, that law supposation is a fact-based inquiry. So let's discuss the facts of this case as determined by Judge Lyman at the district level. You know, my colleague just went on and said that, well, there was only $295,000 of lost loans, and that's a fraction of the overall business. But the fact of the matter is we don't know that. We don't know that because the defendant did not present anything at trial to suggest otherwise. The only evidence presented at trial regarding loans made from global factors were these sham loans to Wall Street Pizza. At any time during that trial, defense could have presented any other contract that was viable, could have presented any witness that said they did business with global factors that was legitimate. They did not. And they will put on notice of this because Randy Langhammer and Wall Street Pizza is specifically mentioned in the complaint. They had over a year and a half to produce a single document, which we had asked for in discovery. The plaintiffs had specifically asked for documents relating to the delinquencies of payments and really the veracity of the contracts that global factors made to its customers. They objected. We need a motion to compel. They opposed. We lost that motion. So therefore, I posit to this court that no, not only 2% of the global factors loans were sham. In fact, 100% of all the evidence presented at trial were sham loans. There's nothing to present otherwise. COVID-19, as I wrote in my brief, was a— I'm sorry. Can you just go back a little bit? Was there evidence that only 2% or even an argument to Schleierman that only 2% of those loans were the sham loans? Of course, you presented the worst, all the sham loans and sham transactions, but was there any evidence that that constituted only 2% of the total? Well, Your Honor, just to clarify, we only presented the three that we were able to obtain. We don't know about any other loans. We didn't just take the worst three that we could find and present at the trial. These were literally— Okay, same question. So the same question is it was positive that this is only a small percentage of the overall book, and that was taken from the evaluation given to Global. I believe it was $1.4 million. It was only $295,000 of loans. But as important to an adverse inference given that all of the other documents that would prove otherwise were solely in defendant's possession, we had absolutely no means to obtain them. So we don't know any other customers of Global. We just so happened through our own investigation to have found Manu Langhammer and Wall Street. So there was an adverse inference is what you're saying. There was an adverse inference given by the trial court on this. And the entire description of Global Factors and of its business and how it operated is based solely on the testimony of Ralph Johnson at trial, testimony that Judge Lyman determined was not credible. And we know this court gives great deference to the trial court's determination, especially on the issues involving credibility and determination. That is citing this court in, as I could quote, the NYU as well as Phoenix Global Ventures. Going back to the loss causation analysis, my colleagues spent a lot of time discussing Judge Posner's case in Baskin and saying that there was an intervening act here of the global pandemic that caused all of the losses. That if Mr. Marr had decided to invest in an honest factory company that he still would have lost his money. Aside from the fact that there is no evidence to state that, there is a – this case is distinguishable from Baskin based on Judge Posner's own example given in that ruling. Judge Posner in discussing – Judge Posner in discussing the – I apologize – in discussing the loss causation gives an example, and that example is let's say a stockbroker presents an investment to a customer. And he says this is a risk-free investment. It turns out it's not. And, of course, it's a risky investment. The investor loses his money. Well, in that case, the loss causation of the withheld misstatement that this is risk-free caused the loss because the investor was looking for a risk-free investment. It's distinguished because in Baskin, that investor was looking to invest in oil and gas regardless as to whether it was an honest or a dishonest oil and gas company. And, of course, the price of markets for oil collapsed, leaving all honest and dishonest ventures to lose money. But in this case, the record shows clearly Dennis Maher for months conversed with Ralph Johnson to discuss the security of the loans made by Global. He had two main objectives. The first one being does Global have enough assets on its books to continue to make payments to its investors? And two, what are these loans that they make? What are the security of these loans? And Johnson repeatedly told them these are triple-secured loans, and that was the picture that was given to brokers as testified by Christopher Rossi at trial, that these loans were – sorry. These businesses were fully vetted for their financial security. They pledged collateral, and they were given personal guarantees. And there was a default that they would vigorously collect the loan. None of that is true. They want to say that – my colleague wants to say that COVID caused these businesses to go under to make them unable to collect loans. But there's evidence at trial from the audit report that was done after the fact. This is an August 21st audit report. It was Plankton's Exhibit 79. And it shows that there were loans given, nine specific loans that were given between 2018 and April of 2019. So we're talking about a year before COVID even happened. Zero was collected. For that year prior to COVID and, of course, during COVID, zero dollars were collected. No evidence was presented at trial that little factors went after these individuals that weren't paying, that there was any UCC collateral calls, that there was any sort of call for the personal guarantees. So even at that time, while Dennis Maher is telling Ralph Johnson how he needs these loans to be secure, he knows not only does he have these sham loans to Wall Street Pizza that I've already entered into, but he's got other – at least seven other loans on the books that have collected zero that he has made absolutely no effort to collect. So COVID was not intervening in that. COVID simply exposed fraud. And it goes to how Judge Lyman in his determination explained the business of global factors. And he explained that global factors was a business that did not make loans to small businesses that they later collected on. Instead, this was a business that relied on enticing new investors to put fresh capital into a company so the company can continue to hide the malfeasance of the money that it had and to continue to pay its investors with new investor money. And I don't mean to tell Your Honor about how Ponzi schemes work, but it's clearly foreseeable that a Ponzi scheme would run out, and it does not take a global pandemic for the rug to get pulled out from under a Ponzi scheme. Thank you very much. Your Honor. Mr. Feynman. Yeah. First of all, the PPM doesn't require – and if you read it, it's in the record in pages 29 and 117 – doesn't require any collateral. But when it does talk about that, it says it may or may not be secured. But when they do require us to talk about collateral, we talk about the accounts receivables as being the collateral. But what happened to COVID – in COVID, small businesses, their accounts receivable during COVID pandemic, that stopped collateral. Remember, this went across. It wasn't just oil. It wasn't just this internet bubble. It was every sector, across every sector. And the fact that certain small percentage weren't collected – remember, they collect – he says you have to bring a collection action. There were some loans, as Ralph Johnson testified. I would go after them right away since I would give them time to pay. I mean that's how I work with my clients. I have plenty of clients that owe me money. And some, they let me give them a little line to pay back. In any event, Lost Causation assumes that fraud exists. And Judge Posner and this court, First Nationwide, say it's up to you. And they said in the beginning of the complaint, they don't even allege it. But you have to prove that you otherwise would not have lost. Help me out here. Help me out here. I may be confused because your reply brief says on page 18 that the defendants did not object to plaintiff's dollar calculation if rescission damages would be awarded. The dollar amount, in other words, the arithmetic was correct. If rescission damages were – if rescission damages – if rescission was the measure of damages. We say rescission is here to get out of the COVID free card. The district court recited that there was no dispute as to rescission as a measure of damages. As to the arithmetic. It's in the record. Of course we objected to rescission. We said it should be the high court's decision. That wasn't the counsel. But the answer was – rather the position was it shouldn't be rescission. But if you do rescission, he talks about it in the rescission line. Isn't rescission a standard measure of damages for fraud? Not always in Judge Canfield's case. I didn't say always. I said isn't it a standard measure? In this case it shouldn't be. It was only a small tiny percent, 2%. In one of the other cases they said 5% is enough. Aside from the fact that he took things that happened after COVID and transposed it to an earlier event. And we addressed that. He took the temporal elements. And that's also in Canfield and in one of the other cases that we cite. Right here. Where temporal element is in First Nation right also. Judge Lyman relied on things that happened years later in COVID to support a fraud claim that happened years before COVID. So I think that was improper. And rescission is definitely not proper in this case. $295,000. Here, I'll give it back to you. And that also mixes up transaction causation with loss causation. If I knew this, I wouldn't have gone into it. Well, that's transaction causation. There's all these cases made clear. Then you've got to get to loss causation. $295,000 and giving you a share, that's $20,000. I think that we have the full benefit of the arguments on both sides. I thank you. We'll reserve the decision.